UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DWAYNE WINGO,                              )
                                          )
              Petitioner,                 )
                                          )
v.                                        )          No. 4:12 CV 2072 SNLJ (JMB)
                                          )
TROY STEELE,                              )
                                          )
              Respondent.                 )

**REPORT AND RECOMMENDATION**

Dwayne Wingo ("Wingo") has petitioned the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter was referred to the undersigned United States Magistrate Judge by the Honorable Stephen N. Limbaugh, Jr., United States District Judge, for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). The undersigned concludes that this matter may be resolved on the existing record, without the need for an evidentiary hearing. The undersigned recommends that Wingo's application for a writ of habeas corpus be denied. The undersigned also recommends that no certificate of appealability issue.

**I.      Procedural and Factual Background**

**A.  Introduction**

Wingo is currently serving a twenty-six year sentence at the Potosi Correctional Center in Mineral Point, Missouri, having been convicted after separate jury trials for first degree robberies of two different fast food restaurants in St. Louis County. The first robbery occurred on November 22, 2005. The second robbery occurred less than three weeks later, on December 11, 2005. Wingo was also implicated in an attempted robbery of a different fast food restaurant which occurred shortly before the completed robbery on November 22, 2005. During the time of

the attempted and actual robberies, Wingo was serving a period of community incarceration at the St. Louis Community Release Center ("SLCRC").

**B.  <u>Factual Background</u>**[1]

On November 22, 2005, Lakisha Candies was working as the assistant manager of a Jack In The Box restaurant in St. Louis County.  At approximately 6:30 p.m., Wingo walked into the restaurant.  Candies asked Wingo whether she could help him; but Wingo did not respond.  As Candies was helping other customers, Wingo pulled a note out of his pocket and handed it to Candies.  The note read:  "calmly put the money in the bag and hand it to me or I'll shoot." (Resp. Ex. T Memorandum at 2)  Candies responded that "it was bullcrap," opened the cash register, and put money in the bag.  During this time, Wingo had his hands in his pockets, giving the impression that he had a gun.  (Id.)

Meanwhile, half an hour before this robbery, at about 6:00 p.m., Wingo attempted to rob a Hardee's fast food restaurant, about a five minute drive away, within the City of St. Louis.  (Id. at 2-3)  Wingo walked into that restaurant and was greeted by Paris Powell, who was working as a cashier that night.  Wingo slid a greeting card-type envelope to her on the counter.  On the envelope it read, "put the money in a bag or I will shoot you."  (Id. at 3)

Powell tried to comply with Wingo's demand and open the drawer to get the money out. She was unable to do so, because she was nervous.  Wingo's hands were in his pockets, and Powell thought he had a gun.  Powell told Wingo that she was unable to open the drawer.  Wingo replied:  "I will shoot you.  Just put the money in a bag.  I can tell you are bluffing …."  (Id.) Powell insisted that the drawer would not open, and Wingo walked out of the door.  After Wingo

---

[1]        This factual summary is drawn from the transcript of the pretrial motion to suppress identification evidence and sever the two robberies, as well as the opinions of the Missouri Court of Appeals.  The undersigned reviews the facts in the light most favorable to the jury verdicts.

left, Powell called the police. The police subsequently discovered Wingo's fingerprint on the envelope he used in the attempted robbery. (Id.)

A few weeks later, in the early morning hours of December 11, 2005, Stephen Holtschlag was working the drive-through window at a different Jack In The Box restaurant in St. Louis County. (Resp. Ex. K at 2) Wingo walked up to the drive-through window, where Holtschlag asked if he could help. Wingo said he had a gun in his pocket, and ordered Holtschlag to give him all of the money in the drawer and from the drop box. The drop box contained excess cash, large bills and various receipts. Holtschlag gave Wingo the money from the register and the drop box, which Wingo put in his pockets as he walked away. The total amount taken during that robbery was $735.35. Holtschlag called 911. (Id.)

The police arrived at the scene of the December 11th robbery almost immediately. Police officer Nino Dicandia responded within one minute. The dispatcher described the robber as a black male wearing dark-colored clothing and a stocking cap. As officer Dicandia drove toward the restaurant, he saw a car pull out of a nearby parking lot containing businesses that were all closed for the night. Officer Dicandia thought this was suspicious and followed the car. At a stop light, the officer shined a spotlight into the car's interior. Officer Dicandia noted that the driver of the car fit the description of the robbery suspect. (Id.) The car then began speeding, which caused Dicandia to activate his lights and siren, but the car did not stop. Officer Dicandia pursued the car at high speed onto Interstate 55 into the City of St. Louis until the car slid on some ice and struck a church. Even after crashing, the driver attempted to run away, but he was captured after he slipped and fell. The driver was Wingo. Another officer, Jason Neuman, found $736, a receipt, and a coupon from Jack In The Box in Wingo's pocket. (Id. at 3)

Officer Neuman then transported Wingo to the Fourth Precinct of the St. Louis County Police for booking and processing. (Resp. Ex. B at 250-53) Officer Neuman seized the money and Jack In The Box receipts in Wingo's pockets as he arrested him, and turned that evidence over to Detective Leslee Tate.

On December 11, 2005, Detective Tate was assigned to investigate the robbery of the Jack In The Box. Detective Tate arrived at the scene at 3:30 a.m., shortly after the robbery and subsequent car chase. (Resp. Ex. A at 5) Detective Tate interviewed Holtschlag at that time, as well as Kelly Halbert, the store manager. (Id. at 5-6) During the course of investigating the December 11th robbery, Detective Tate learned that the November 22nd robbery might be connected. (Id. at 12) Detective Tate had not originally been assigned to investigate the November 22nd robbery, but Officer Dicandia noticed that a composite drawing of the suspect of the November 22nd robbery "looked very similar" to the suspect from the December 11th robbery. (Id. at 13) As discussed below, that information led Detective Tate to bring Candies in to look at a photographic and live lineup in an attempt to identify the perpetrator of the November robbery of the Jack In The Box.

Although Wingo was initially arrested on suspicion of armed robbery and resisting arrest regarding the December 11th robbery, he had another warrant out for his arrest at this time. A warrant was issued at 9:00 a.m. on December 10, 2005, by the Missouri Department of Corrections ("DOC") because Wingo had "absconded" from the SLCRC, where he had been staying at the time. Because of this outstanding warrant, Wingo was not released after the expiration of his 24 hour "hold."[2] Indeed, Wingo was held on that DOC warrant until it was cancelled later on the night of December 12th, when he was returned to the SLCRC.

---

[2]     Throughout this case, the parties refer to Missouri's 24 hour "hold" law, and this Missouri statute is a central feature of this litigation. This "hold" law refers to Mo. Rev. Stat. § 244.170.1, which provides that:

While Wingo was being held on this DOC warrant, on the evening of December 12, 2005, at 8:00 p.m., the victim from the December 11th robbery, Stephen Holtschlag, came to the St. Louis County Jail to view a live lineup. (Id. at 7-11) Officers arranged the live lineup by placing Wingo, along with other individuals similar in physical characteristics, in a room with a one-way mirror, and asking Holtschlag if he recognized anyone. (Id. at 10) Holtschlag identified Wingo as the suspect who had robbed him on December 11, 2005. (Id.)

Also on the evening of December 12, 2005, the victim from the November 22, 2005 robbery, Lakisha Candies, came to the St. Louis County Jail to view a live lineup, as well as a photographic lineup. (Resp. Ex. A. at 13-15) Detective Tate showed Candies a photographic lineup and asked her if she could identify anyone in the photograph. The photographic lineup was a computer-generated lineup that included a photo of Wingo, and other individuals of the same age and physical description. (Id. at 14) Candies pointed to the first photograph (which was Wingo) as the person who robbed her store on November 22, 2005. (Id. at 15-16). Detective Tate then asked Candies to view a live lineup. Candies viewed the lineup shortly after Holtschlag, and under similar circumstances. (Id. at 17) She immediately identified Wingo as the person who robbed her store. (Id. at 17-18)

Detective Tate then showed the same photographic lineup to Mark Granda, another witness to the November 22nd robbery. (Resp. Ex. A at 18-19) Granda pointed to the picture of Wingo, saying that he "looked very similar" to the person who had robbed the Jack In The Box. (Id. at 18)

---

All persons arrested and confined in any jail or other place of confinement by any peace officer, without warrant or other process, for any alleged breach of the peace or other criminal offense, or on suspicion thereof, shall be discharged from said custody within twenty-four hours from the time of such arrest, unless they shall be charged with a criminal offense by the oath of some credible person, and be held by warrant to answer to such offense.

After taking Granda through the photo lineup, Detective Tate talked with Granda, who then gave indications that this was the second lineup he had seen. Detective Tate did not know it at the time she conducted her lineups, but Granda and Candies had seen an earlier photo lineup. In that earlier lineup, Candies identified someone other than Wingo as the person who robbed her store on the 22nd of November.[3] (Id. at 35-39) Apparently, however, this knowledge did not change Detective Tate's mind that Wingo was the most likely suspect, because she applied for warrants to hold Wingo on both robberies shortly thereafter. (Id. at 38)

### C. Procedural History

Wingo was charged with three crimes. He was charged with robbery in the first degree regarding the November 22nd incident, and robbery in the first degree and resisting arrest, regarding the December 11th incident. On the morning of trial, the parties agreed to sever the December robbery and resisting arrest charges from the November robbery charge. On April 9, 2009, a jury convicted Wingo of robbery in the first degree, and resisting arrest, for the December 11th incident. On June 24, 2009, a different jury convicted Wingo of robbery in the first degree, for the November 22nd incident. Wingo was also found to be a prior and persistent offender, because of multiple prior felony convictions. As such, he was sentenced to consecutive terms of twenty years and four years in prison after his first trial. He was sentenced to twenty-

---

[3]     That earlier lineup was done by Detective Robert Vogel on December 9, 2005. (Resp. Ex. O at 111) According to Candies' testimony at trial, she went down to the police station, was shown a photo lineup, and did not see the person who robbed her in the lineup. (Id. at 112) Wingo's photo was not among those included in the lineup, because he was not a suspect at this point. Detective Vogel asked Candies if "anybody in the picture" looked familiar to her. (Id. at 113) Apparently, she did recognize someone in the photos—an individual named Glenn Hughes, whom she knew socially. (Id.) According to Candies, Vogel suggested to her that "if he looked familiar" to her, he was probably the one who robbed her. (Id. at 114) Candies protested that Hughes was not the person who robbed her, but thought that Detective Vogel wanted her to pick Hughes anyway. (Id. at 115) Candies therefore did circle Hughes' picture as the person who robbed her, but when she came back on December 12th, she immediately identified Wingo as the person who actually robbed her. All of this information was discussed in detail at trial and the defendant (who represented himself at the second trial, along with stand-by legal counsel) extensively cross-examined Ms. Candies in the presence of the jury. (Id. at 111-69)

six years in prison after his second trial.  The second sentence was ordered to run concurrent with the twenty-four years from the first sentence.

Wingo filed separate direct appeals after each trial.  On appeal from the first trial, Wingo raised the sole point that the trial court erred in denying a motion to suppress evidence of the identification made by Holtschlag.  Wingo argued that the identification was tainted by impermissibly suggestive procedures because he appeared in a photo lineup before he appeared in a live lineup, and was the only person to appear in both lineups.  (Resp. Ex. E at 7)  Because Wingo did not object to the introduction of this evidence at trial, the Missouri Court of Appeals held that the issue was not preserved, and thus reviewed it only for plain error.  (Resp. Ex. G at 3)  This requires a finding that manifest injustice or a miscarriage of justice resulted from the alleged trial court error.  (Id.)  The court noted that, under Missouri law, "a person's presence in both lineups does not make the procedures impermissibly suggestive."  State v. Williams, 277 S.W.3d 848, 851 (Mo. App. E.D. 2009).  Similarly, the Missouri Court of Appeals concluded that the fact that Wingo was the only person who appeared in both the photo lineup and live lineup did not make the procedures impermissible suggestive.  State v. Glessner, 918, S.W.2d 270, 277 (Mo. App. S.D. 1996).  Under these circumstances, the court held there was no plain error.  (Resp. Ex. G at 4-5)

On direct appeal from the second trial, Wingo's sole point was that the trial court plainly erred in allowing the state to introduce evidence of the attempted robbery of the Hardee's restaurant on November 22, 2005.  (Resp. Ex. R at 12)  Wingo argued that allowing this evidence resulted in a manifest injustice and constituted a denial of due process rights.  (Id.)  Applying the plain error standard of review, because Wingo did not preserve his objection, the state court denied this point.  (Resp. Ex. T. at 3-4)  The Court of Appeals held that the trial court

did not plainly err in admitting the evidence because—while evidence of previous crimes is not admissible to show Wingo's propensity to commit a crime such as the one for which he was on trial—it was admissible as evidence of identity.  (Id. at 4-7)

Wingo filed two post-conviction motions in state court—one relating to the first trial and direct appeal, and one relating to the second trial and direct appeal.  In the first post-conviction motion (which relates to the December 11th incident), Wingo argued that his due process rights were violated because he was denied effective assistance of counsel in that his appellate counsel failed to raise on direct appeal the argument that evidence and identifications were illegally admitted into evidence against him.  (Resp. Ex. H at 20-21)

In his second post-conviction motion (which relates to the November 22nd incident), Wingo argued:  (1) he was deprived effective assistance of counsel because appellate counsel failed to raise the argument that evidence and identifications were illegally admitted into evidence against him; and (2) he was denied effective assistance of counsel because his direct appeal attorney did not raise the argument that Lakisha Candies' identification was tainted by unduly suggestive police procedures.  (Resp. Ex. U at 23-34)  Wingo's post-conviction relief motions were denied.  He then appealed both denials.  The Court of Appeals affirmed the motion court's denial in both instances.

Wingo then filed two separate habeas corpus petitions in federal court (one relating to the first trial, and one related to the second trial).  Wingo then petitioned the Court to consolidate the two matters.  (ECF No. 4)  The District Court consolidated the two petitions under Federal Rule of Civil Procedure 42(a), finding that the two petitions "involve common questions of law and fact." (ECF No. 8)  Wingo then filed an amended petition, which consolidated his issues into a

single document. The State of Missouri filed its response, and Wingo filed a reply thereto. (ECF Nos. 13, 16, and 20) The matter is fully briefed and may be resolved on the existing record.

## II. <u>Issues Raised</u>

In this consolidated petition, Wingo raises five total grounds for issuance of the writ. Grounds one and two arise out of the first trial and direct appeal, while grounds three through five arise out of the second trial and direct appeal. Regarding the first trial, Wingo argues that he is entitled to the writ because of: (1) ineffectiveness of appellate counsel in failing to raise a claim on appeal that the physical line-up was improper because the police (i) held Wingo beyond the time permitted by state law, (ii) compelled Wingo to participate in the line-up, and (iii) denied his request for counsel; and (2) that the procedure used in Holtschlag's identification of Wingo was unduly suggestive.

Regarding the second trial, Wingo reasserts as ground three the first substantive claim made in the first trial—that appellate counsel was ineffective for failing to raise the impropriety of Wingo's physical lineup on appeal. As ground four, Wingo asserts that his appellate counsel was ineffective for failing to raise the claim that the lineup and identification procedures were impermissibly suggestive. Additionally, Petitioner asserts as his fifth ground a claim—arising out of the second trial—that the trial court plainly erred in allowing evidence of the attempted Hardee's robbery to be admitted at Petitioner's trial.

## III. <u>Discussion</u>

### A. <u>Applicable Legal Standards</u>

#### 1) <u>Standard of Review and Procedural Framework</u>

Review of Wingo's claim is governed by The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA mandates a review of Wingo's claims that is both "limited

and deferential" to the decisions of the state courts.  <u>Lumholt v. Iowa</u>, 327 F.3d 748, 751 (8th Cir.

2003).  Under AEDPA, a federal court may not issue a writ of habeas corpus to a state prisoner

unless the state court's adjudication of a constitutional claim "was contrary to, or involved an

unreasonable application of, federal law as determined by the Supreme Court, or was an

unreasonable determination of the facts in light of the evidence presented in state court."  <u>Cole v.

Roper</u>, 623 F.3d 1183, 1187 (8th Cir. 2010) (citing 28 U.S.C. § 2254(d)).  Thus, a state court

decision "may be incorrect, yet still not unreasonable …."  <u>Id</u>.  A federal court may grant habeas

relief "only if the state court decision is both incorrect and unreasonable."  <u>Id</u>.

"A state court decision is 'contrary to' the Supreme Court's clearly established precedent

if the state court either 'arrives at a conclusion opposite that reached by [the Supreme] Court on a

question of law' or 'decides a case differently than the [Supreme] Court has on a set of

materially indistinguishable facts.'"  <u>Bucklew v. Leubbers</u>, 436 F.3d 1010, 1016 (8th Cir. 2006)

(quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000)).  A state court decision is "an

'unreasonable application' of Supreme Court precedent if it 'identifies the correct governing

legal principle … but unreasonably applies that principle to the facts of the prisoner's case.'"  <u>Id</u>.

"Further, 'a determination of a factual issue made by a State court [is] presumed to be correct' in

a federal habeas proceeding."  <u>Cole</u>, 623 F.3d at 1187 (quoting 28 U.S.C. § 2254(e)(1)).

Because several of Wingo's claims challenge the quality of his legal representation, a

discussion of the constitutional standard of deficient representation is necessary.  A claim of

ineffective assistance of appellate counsel is reviewed under <u>Strickland v. Washington</u>.  <u>See

Armstrong v. Gammon</u>, 195 F.3d 441, 444 (8th Cir. 1999).  Thus, to prevail on such a claim,

Petitioner must show both that his counsel's performance was objectively unreasonable and that

there is a reasonable probability that the outcome of his appeal would have been different if

counsel had raised the claim.  Id.  Counsel is not required to raise every colorable claim on appeal.  Roe v. Delo, 160 F.3d 416, 418 (8th Cir. 1998).  Unless there is evidence to the contrary, the Court assumes that the attorney's decision not to raise a claim was a strategic decision to emphasize stronger claims at the expense of weaker ones.  Armstrong, 195 F.3d at 444.

Finally, in the habeas context, there is no review of state evidentiary issues that do not rise to constitutional dimensions.  See Dowling v. United States, 493 U.S. 342, 352 (1990) (holding that an evidentiary issue only assumes constitutional significance where its introduction is so extremely unfair that its admission violates fundamental conceptions of justice).

### 2) **Procedural Default**

Because the State argues that several of Wingo's claims are procedurally barred, a discussion of the procedural default doctrine is necessary.  Where a federal habeas corpus petitioner fails to follow a rule of state procedure at trial, on appeal, or on state post-conviction review, a federal habeas court should dismiss the petition, unless the petitioner can show either: (1) good cause for failure to follow the rule of state procedure, and actual prejudice resulting therefrom; or (2) that a miscarriage of justice would result if the court did not address the merits of the petitioner's claim.  See Wainwright v. Sykes, 433 U.S. 72 (1977); and Murray v. Carrier, 477 U.S. 478, 495-96 (1991).

A final issue in this case is whether the procedural default rule applies to any error Wingo failed to raise at trial and which the state appellate court reviewed only for plain error.  This question was recently resolved in Clark v. Bertsch, 780 F.3d 873, 877 (8th Cir. 2015) (holding that a state court's discretionary plain-error review of a petitioner's unpreserved claims cannot excuse a procedural default).  Thus, any claims defaulted at trial and reviewed for plain error are procedurally defaulted before this Court.  (Id.)

### B. **Grounds**

#### 1) **The First Trial**

##### a. **Ineffective Assistance of Appellate Counsel For Failing To Raise Claim That Physical Lineup Was Improper**

Wingo's first claim is that he received ineffective assistance of appellate counsel because appellate counsel failed to raise a claim on direct appeal that identifications resulting from a live lineup should have been suppressed because: (1) he was detained for more than twenty four hours; (2) he was "coerced" into participation in a lineup; and (3) he was denied counsel. (ECF No. 13 at 2)

Respondent argues that this claim is actually three "sub-claims," and that Wingo has procedurally defaulted the latter two because he only argued before the Missouri Courts that his appellate counsel was ineffective for failing to raise the claim that the lineup was improper because he was detained for more than twenty-four hours. (Resp. Br. at 12)

Usually, this type of deficiency would be categorized as a failure to exhaust state court remedies. But where a petitioner has not properly exhausted state remedies on a claim and the time for doing so has expired, he has procedurally defaulted those claims. Welch v. Lund, 616 F.3d 756, 758 (8th Cir. 2010). Whether this Court categorizes Wingo's deficiency as exhaustion or procedural default, it is clear that this Court cannot address the substance of Wingo's second and third sub-claims without Wingo showing cause and prejudice for his failure to address these arguments to the state courts. Id. at 760.

In his Reply, Wingo argues that he has in fact raised all of the issues relating to the detention before the Missouri courts. (See ECF No. 20, at 2) However, the record is clear that before the Missouri courts, he contested his detention solely on the grounds that it violated Missouri's "24 hour hold" law. (See, e.g., Resp. Ex. H at 20-21; Resp. Ex. I at 14) In his Reply

brief, Wingo now seems to be blaming his post-conviction relief counsel for not pursuing the expanded grounds for finding Wingo's detention unlawful.  (See ECF No. 20 at 4) ("Petitioner has no idea why appellate counsel Scott Thompson would leave such an important detail out of the Amended Motion.")  The undersigned will liberally construe Wingo to be making an allegation that ineffective assistance of post-conviction counsel excuses his procedural default.

The undersigned notes that alleged attorney errors in initial-review collateral proceedings may, in certain instances, qualify as cause for a procedural default.  Martinez v. Ryan, 132 S. Ct. 1309 (2012).  But in order for ineffective assistance of counsel to excuse a procedural default, Wingo must demonstrate that the underlying ineffective assistance of counsel claim is a "substantial one," which means that it has some merit.  Id. at 1318.  In this case, the undersigned is not persuaded that the ineffective assistance of appellate counsel claim is substantial, because the underlying constitutional claims have no merit.

The underlying ineffective assistance of appellate counsel claims have no merit because Wingo is alleging violations of constitutional rights that do not exist, and appellate counsel could not be ineffective for failing to raise those arguments.  First, suspects can indeed be compelled to participate in investigatory lineups.  See United States v. Wade, 388 U.S. 218, 222 (1967) (holding that forced participation in a pretrial lineup does not violate the right against self-incrimination).  Second, there is no constitutional right to counsel in a pre-charge lineup.  See Kirby v. Illinois, 406 U.S. 682, 689-90 (1972) (holding that the right to counsel at a pretrial lineup does not apply to identifications that occur before the defendant has been charged).

Because there were no underlying constitutional violations relating to the two sub-claims, appellate counsel was not ineffective for failing to raise those arguments as grounds for suppressing the identifications.  Indeed, the Sixth Amendment does not even require that all

*plausible*, or *non-frivolous* claims be raised.  See New v. United States, 652 F.3d 949, 953 (8th Cir. 2011).  Thus, Wingo's underlying ineffective assistance of counsel claim is not a substantial one under Martinez.  Therefore, even if Wingo's post-conviction counsel erred, under the Martinez substantiality requirement, Wingo still has not demonstrated cause and prejudice for procedurally defaulting his two sub-claims.

Wingo's remaining sub-claim that his appellate counsel was ineffective because she failed to argue his detention was illegal due to his detention in violation of Missouri law is properly before this Court.  The undersigned finds that the Missouri Court of Appeals' disposition of this issue was in accordance with AEDPA because that court correctly identified the controlling law in this context—the Strickland standard—and reasonably applied that law to the facts of this case.

As an initial matter, the Missouri Court of Appeals correctly stated the federal law governing assistance of counsel.  (Resp. Ex. K at 5-6) ("To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) his attorney's performance did not conform to the degree of skill, care, and diligence rendered by a reasonably competent attorney under similar circumstances; and (2) as a result of his attorney's performance, he was prejudiced.")

Next, the Missouri Court of Appeals reasonably applied the Strickland standard to the facts of this case.  In so finding, the undersigned notes that the Missouri Court of Appeals had to rule upon several issues of state law, and this Court is bound by those determinations.  See Dodge v. Robinson, 625 F.3d 1014, 1019 (8th Cir. 2010) (explaining that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

First, the Missouri Court of Appeals had to determine whether, as a matter of state law, Wingo had a meritorious appeal that counsel should have briefed.  In this instance, the Court of

Appeals had to construe Section 544.170 of the Missouri Revised Statutes, which requires all people arrested without a warrant to be discharged after twenty-four hours unless they are charged with a crime or held by a warrant. The Court of Appeals found that Wingo was not being held in violation of state law when the lineups were conducted. Although he was arrested on suspicion of robbery, he was being held on a separate warrant from the DOC. (Resp. Ex. K at 7-8) Thus, there was no violation of state law. This Court is bound by that determination. Dodge, 625 F.3d at 1019. Because there was no violation of state law, it was not objectively unreasonable for appellate counsel to fail to raise that issue, and in any event, there is no prejudice from appellate counsel failing to raise that issue.

Second, the Court of Appeals determined that as a matter of state law, on direct review, Wingo's claims were subject to a plain error review standard. (Resp. Ex. K at 6-7) This was because Wingo failed to object to the introduction of the identifications at trial. In order for Wingo's direct appeal to succeed under a plain error standard, Wingo would have had to show that "manifest injustice or a miscarriage of justice occurred as a result of the identification evidence."

The Missouri court held that it was a reasonable determination of appellate counsel that briefing that particular argument would not have led to a different outcome, given the overwhelming other evidence of Wingo's guilt presented at trial, including: (1) the 911 dispatcher's description of the robber and Officer Dicandia's description of the robber, which matched Wingo's description; (2) Wingo fled the area of the robbery and led police on a high-speed car chase; and (3) Wingo was apprehended with cash matching the amount taken from the restaurant and with receipts and coupons from the restaurant's drop box. (Id. at 7) Thus, the

Missouri Court of Appeals was not unreasonable in finding that appellate counsel was not ineffective.

The Missouri Court of Appeals thus correctly identified and reasonably applied federal law as determined by the Supreme Court of the United States. There were no unreasonable findings of fact. Wingo is not entitled to relief on this ground. See 28 U.S.C. § 2254(d).

> **b. Whether The Trial Court Erred In Failing To Find That The Lineup Seen By Holtschlag Was Impermissibly Suggestive, and Therefore, Identification Evidence Should Have Been Suppressed**

Wingo's second claim for relief is that the trial court erred in failing to suppress identification evidence and testimony from Holtschlag because the identification procedures used were impermissibly suggestive, leading to an unreliable identification. This is a due process issue.[4] Wingo argues that Holtschlag's identification of him was "impermissibly suggestive" because Wingo appeared in a photo lineup that Holtschlag viewed before the live lineup, and Wingo was in fact the only person to appear in both lineups. (ECF No. 13 at 3)

Wingo procedurally defaulted this claim. Wingo did not contest the identification evidence at trial. Therefore, the Missouri Court of Appeals reviewed on direct appeal for plain error only. (Resp. Ex. G at 3) As noted above, a state court's review of a claim for plain error does not excuse a procedural default. See Bertsch, 780 F.3d at 877. Wingo has not made any showing of cause or prejudice in failing to present this claim to Missouri Courts, and thus, this Court cannot consider the merits. Wainright v. Sykes, 433 U.S. at 87.

---

[4]     Respondent articulates this claim as an ineffective assistance of counsel claim for failing to contest the substantive constitutional issue of failing to suppress the identification. The undersigned believes that Wingo is making a substantive constitutional claim—he makes no mention of his lawyer's failure to raise that claim. Regardless, due to the undersigned's finding that there was no constitutional violation in the failure to suppress the identification, there can obviously be no prejudice to Wingo, which means that if the Court agreed with Respondent that this was an ineffective assistance of counsel claim, it would fail. See Anderson v. Goeke, 44 F.3d 675, 680 (8th Cir. 1995) (holding that where there was no due process violation in admitting "other crimes" evidence, there can, by definition, be no ineffective assistance of counsel claim for failing to raise that due process violation in the first place).

Even if Wingo had not defaulted his due process claim regarding the procedures used in Holtschlag's identification, such a claim would fail on the merits because the Missouri court's plain error review correctly cited and reasonably applied the relevant federal constitutional law in accordance with § 2254.

First, the court correctly identified the governing law. The Court of Appeals noted that "identification testimony is admissible unless the pretrial identification procedure is impermissibly suggestive and this suggestive procedure made the identification unreliable." (Resp. Ex. G at 3) The court then noted that "[a] pre-trial identification is unduly suggestive if the identification is not the result of the witness's recollection of first-hand observations, but rather from the procedures or actions employed by the police." (Id.) This tracks the due process standard of Simmons v. United States, 390 U.S. 377, 384 (1968). Finally, the Missouri Court also correctly identified the relevant factors governing reliability as articulated in Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

Second, the state court then held that the mere fact that the defendant was in both the photographic and physical line-up does not alone render the line-up impermissibly suggestive. (Resp. Ex. G at 4) This was not an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. In fact, this holding is in accordance with clearly articulated federal law in the Eighth Circuit. See Armstrong v. Gammon, 195 F.3d 441, 445 (8th Cir. 1999) (holding that the fact that a defendant is the only suspect to appear in two separate lineups is insufficient to show that the procedure is impermissibly suggestive). Because the Missouri courts properly identified the correct federal constitutional law, reasonably applied that law to the facts of this case, and made no unreasonable findings of fact, Wingo would not be entitled to a writ on this ground even if it had not been procedurally defaulted.

2) **The Second Trial**

a. **Ineffective Assistance of Appellate Counsel For Failing To Raise Claim That Physical Lineup Was Improper**

Relating to the second trial, Wingo again argues that his appellate counsel was ineffective when she failed to raise a claim that the eyewitness identifications should have been suppressed due to Wingo's allegedly illegal detention. This ground should be denied for the same reasons as the corresponding argument stemming from Wingo's first trial. See *supra*, Part III(B)(1)(a).[5]

b. **Ineffective Assistance of Appellate Counsel For Failing To Raise Claim That Identification Procedure Was Unduly Suggestive**

Wingo's second claim relating to the second trial is that his appellate counsel was ineffective for failing to raise, on direct appeal, an argument that the trial court erred in allowing impermissibly suggestive identifications into evidence. Specifically, Wingo argues that the identification evidence provided by Lakisha Candies was influenced by impermissibly suggestive police practices in two ways, and led to Wingo's misidentification.

First, Wingo argues that Candies was "pressured" into identifying Wingo as the robber after a different photo lineup done three days earlier. (Resp. Ex. U at 34-37) Wingo alleges that in this first photo lineup, Candies was presented with a photo array (in which his photo did not appear), and asked if anyone looked familiar. Candies apparently said that an individual named Glenn Hughes looked familiar, but not as the robber of her store. Wingo alleges that the police officer suggested to Candies that Hughes must be the robber, but she maintained that he was not, even though she later circled his photo in the lineup. Wingo alleges that Candies felt pressured to identify "someone" as the robber, or she would have been considered an accomplice. Three

---

[5]  After his second trial, Wingo's appellate counsel raised only one point of error—that the evidence of attempted robbery should have been excluded. (Resp. Ex. R at 12)

days later, Candies was brought in to look at lineup evidence that included Wingo, and she immediately identified him as the robber instead of Hughes.

The second ground for suggestiveness put forward by Wingo is the fact that he was the only suspect to appear in both the live lineup and a photo array.  (Resp. Ex. U at 33-38)  Wingo argues that appellate counsel was ineffective for failing to raise these points on appeal.

In discussing these arguments, the Missouri Court of Appeals once again identified the correct governing law for ineffective assistance of counsel claims.  (Resp. Ex. X at 2-3)  That court also noted that Wingo's two arguments for finding that the police procedures violated the due process clause were not preserved at trial.  Thus, on direct appeal, those issues would only be reviewed for plain error.  (Id. at 4)  Also, the 29.15 motion court had to construe and apply federal due process law relating to identifications.[6]  The undersigned must determine whether the state courts correctly identified and reasonably applied the governing law relating to identifications under the due process clause.

Clearly established federal law relating to due process standards for identifications (as determined by the Supreme Court) requires a two-step inquiry.  Schawitsch v. Burt, 491 F.3d 798, 802 (8th Cir. 2007).  The first step is to determine whether the procedures used were impermissibly suggestive.  If they were impermissibly suggestive, the second step is whether, under the totality of the circumstances, the procedures used created a substantial risk of misidentification at trial.  Id.; see also Simmons v. United States, 390 U.S. 377, 384 (1968).

The post-conviction motion court found that appellate counsel could not be ineffective for failing to raise that issue because there was no prejudice resulting to Wingo, finding the claim would have been unavailing, especially under a plain error standard of review.  (Resp. Ex. U at

---

[6]     The undersigned focuses on the analysis of the 29.15 motion court because the Missouri Court of Appeals appears to have largely adopted the reasoning of the motion court in its denial of Wingo's appeal.  (See Resp. Ex. X)

57-59)  The motion court held that the claim would have been unavailing because, "[i]dentification testimony is admissible unless the pretrial identification procedure is impermissibly suggestive and this suggestive procedure made the identification unreliable."  (Id.)  This tracks the due process standards articulated by the Supreme Court in Simmons.

The motion court went on to note that an identification is "unduly suggestive" if the identification is not the result of the witness's first-hand recollection, but rather from the procedures or actions employed by the police.  The motion court then noted that in determining reliability, courts must consider:  (1) the opportunity of the witness to view the subject; (2) the witness's degree of attention; (3) the accuracy of any prior description given by the witness; (4) the level of certainty demonstrated by the witness; and (5) the interval between the event and the identification procedure.  This tracks Supreme Court law as explained in Neil v. Biggers. See 409 U.S. at 199-200.

The Missouri court identified the controlling Supreme Court law.  The next question is whether that court reasonably applied that law in this matter.  The undersigned concludes that it did.

The motion court discussed whether the issue of suppression would have been successful on appeal and applied the due process law cited above.  The court first addressed Wingo's argument that Candies was "pressured" to pick Wingo because she had picked a different suspect in the original lineup, then recanted, and felt that she had to pick "someone" in order to avoid suspicion of complicity in the robbery.  The court noted that Wingo has no standing to contest any procedures that happened in the earlier photo lineup, because he was not present, he was not pictured, and he was not even a suspect at that point.  (Resp. Ex. U at 58)  Alternatively, to the extent that the earlier procedures "pressured" Candies into lying on the stand about her

identification of Wingo, the court held that that was an issue of witness credibility for the jury to decide.  (Id.)[7]  The court noted that this point was "argued at length" to the jury, and that the jury may well have disregarded Candies' identification as lacking credibility.  (Id.)  The motion court also alternatively held that Candies' identification was sufficiently reliable, according to the Biggers factors cited above.  (Id. at 59, n. 3)

The undersigned finds that the above analysis is not an unreasonable application of federal due process law.  Any suggestiveness with regard to the first photo lineup does not prejudice Wingo, because he was not involved in that photo lineup and not even a suspect at that time.  Also, assuming that the police did use suggestive procedures that first time to get Candies to pick someone other than Wingo, that would have helped Wingo, by making her subsequent identification of him three days later less credible.

With regard to the second ground of suggestiveness, the motion court correctly noted that "the mere fact that a suspect appears in two separate lineups does not make an identification procedure impermissibly suggestive."  (Resp. Ex. U at 58)  As noted above, this is in accordance with Eighth Circuit law.  See Armstrong, 195 F.3d at 445 (holding that the fact that a defendant is the only suspect to appear in two separate lineups is insufficient to show that the procedure is impermissibly suggestive).

The undersigned also finds that the motion court's alternative holding that, even if there was suggestiveness, Candies' identification was reliable under Biggers, is a reasonable application of federal constitutional law.  The motion court addressed reliability by holding that Candies

> had ample time to view her robber, paid a high degree of attention to the robber, gave a good description of [the robber] and even helped develop a composite, and

---

[7]    To be clear, Candies' prior identification of another suspect was brought out during her testimony.  (Resp. Ex. O at 111-69)

she testified that she was 100% certain of her identifications of [Wingo]. Her identification took place a few weeks after the robbery, but weighed against the other factors, this Court found her identification to be reliable.

(Resp. Ex. U at 59 n.3)

The above reliability analysis is a reasonable application of the <u>Biggers</u> reliability factors. Thus, the Missouri Courts reasonably applied due process law relating to pretrial identifications, in accordance with § 2254(d)(1). In finding no due process violation, the state court then found that there could be no ineffective assistance of counsel claim because appellate counsel would not have been ineffective for failing to raise a losing argument, and in any event, there was no prejudice. This is a correct and reasonable application of the <u>Strickland</u> standard. Petitioner is not entitled to habeas relief on this ground.

### c.  <u>Whether The Trial Court Plainly Erred In Allowing Evidence Of Attempted Hardee's Robbery Into Petitioner's Second Trial</u>

Wingo's final ground for relief is that the trial court should have excluded evidence of the attempted Hardees robbery during his second trial. Again, the second trial related to the November 22, 2005 Jack In The Box robbery. Wingo claims that the admission of evidence of the attempted robbery resulted in a violation of his due process rights. (Amend. Pet. Vol. II at 4) Wingo claims that admission of the evidence violated his due process rights because it was "more prejudicial than probative, and therefore was not legally relevant." (Id.) He also argues that the evidence "impermissibly bolster[ed]" Candies' testimony. (Id.)

Respondent argues that this claim is a non-cognizable issue of state evidence law and that it was procedurally defaulted. The undersigned agrees that Wingo has procedurally defaulted this claim. On direct appeal, the state courts reviewed this issue for plain error because Wingo did not object to the admission of this evidence at trial. (Resp. Ex. T at 4) The review of an issue for plain error by a state court does not prevent operation of a state procedural bar.

Bertsch, 780 F.3d at 877. Wingo does not even allege any potential cause for this default, and therefore, this Court cannot review the merits of Wingo's claim.

Even if this Court could examine the merits of this claim, the undersigned agrees with Respondent that routine evidentiary issues are usually not cognizable. Apart from exceptions such as the confrontation clause, an evidentiary issue only assumes constitutional significance where its introduction is "so extremely unfair that its admission violates fundamental conceptions of justice." Dowling, 493 U.S. at 352; see also Davis v. Campbell, 608 F.2d 317, 319 (8th Cir. 1979) ("The admissibility of evidence is usually a matter of state law and procedure and does not involve federal constitutional issues. A justiciable federal issue is presented in a habeas corpus proceeding only where trial errors infringe upon a specific constitutional protection or are so prejudicial as to amount to denial of due process.").

Additionally, the admission of the evidence in Wingo's second trial was not even a violation of state evidentiary law, let alone a federal constitutional violation. The Missouri Court of Appeals noted that, while evidence of prior criminal acts is never admissible to show propensity, the evidence of the attempted robbery in this instance was admissible for the purpose of proving identity, as part of a "common scheme." (Resp. Ex. T at 5-6) This was because the attempted robbery was sufficiently similar to the crime for which he was on trial, in terms of time, location, and manner. The two incidents formed part of a common scheme. (Id.) Therefore, the Missouri courts held that admission of the attempted robbery was permissible under state evidentiary rules. This Court is bound by that determination. Dodge, 625 F.3d at 1019. Thus, there was not even a violation of state evidentiary law, much less a federal constitutional violation.[8]

---

[8]     In fact, this evidence would probably be admissible in a federal criminal trial under Federal Rule of Evidence 404(b). That rule permits evidence of a "crime, wrong, or other act" in order to prove "motive,

Thus, the undersigned concludes: (1) that Wingo has procedurally defaulted this claim; (2) that even if Wingo had not procedurally defaulted the claim, it would be non-cognizable, because it involves a state evidentiary matter, not a constitutional question; and finally, (3) that the state court evidentiary ruling was right on the merits under state law (which this Court is bound to accept) and that similar evidence would be admitted in a federal criminal trial under Federal Rule of Evidence 404(b). Wingo is not entitled to relief on this ground.

## IV.    Conclusion

For all of the foregoing reasons, the undersigned recommends that Wingo's pro se writ of habeas corpus be denied with prejudice, and that no certificate of appealability issue, because Wingo has not made a substantial showing of the denial of any constitutional right.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Petitioner Dwayne Wingo's amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 13) be denied.

**IT IS FURTHER RECOMMENDED** that no certificate of appealability be granted in this matter, because Wingo has not made a substantial showing of the denial of any federal constitutional right.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result

---

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Such evidence is admissible if: (1) it is relevant to a material issue; (2) it is similar in kind and not overly remote in time to the crime charged; (3) it is supported by sufficient evidence; and (4) its potential prejudice does not substantially outweigh its probative value. United States v. Bassett, 762 F.3d. 681, 687 (2014).

In this instance, the evidence of the Hardee's robbery is: (1) relevant to the identity of the person who robbed the Jack In The Box; (2) the manner of the robbery was very similar in both instances, including a greeting card note being used, and almost identical language; the time and location of the two robberies are very similar; (3) the identification of the victim at the Hardee's restaurant is not challenged; and finally, (4) because the evidence is extremely probative of identity, the potential prejudice to the defendant is not sufficient to outweigh the probative nature of the evidence. The evidence would thus likely be admissible in federal court.

in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of November, 2015